# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| Elk River Pharmacy Inc., STRB Inc., The Pharmacy Station Inc., and Handicapable Inc. d/b/a Medicine To Go Pharmacies,<br><br>　　　　　　　　Plaintiffs,<br>v.<br><br>Express Scripts, Inc. and Express Scripts Holding, Inc.,<br>　　　　　　　　Defendants. | Civil Action No. |

## **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and others similarly situated, bring this civil class action against Defendants Express Scripts, Inc. and Express Scripts Holding, Inc. (collectively "ESI") under the antitrust laws of the United States, and allege as follows:

### I.　　Nature of Action

1.　　This is a civil antitrust suit that challenges a horizontal combination, conspiracy or agreement between ESI and co-conspirator Prime Therapeutics LLC ("Prime") that violates Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). Plaintiffs seek, on their own behalf and on behalf of a similarly situated class, treble damages under § 4 of the Clayton Act (15 U.S.C. § 15) and injunctive relief under §16 of the Clayton Act (15 U.S.C. § 26).

2.　　Prime and ESI are both "Pharmacy Benefit Managers" (or "PBMs"). PBMs are hired and paid a fee by public and private healthcare plans to manage and service the plan's pharmaceutical benefits. In order to perform that function, PBMs enter into agreements with retail pharmacies in which the pharmacies agree to provide pharmaceutical products (usually prescription drugs) and services to members of the healthcare plans that have hired that PBM. In

return for the retail pharmacies' providing pharmaceutical products and services to the plan members, the PBMs agree to the prices to be paid to the pharmacies for the drugs and services they deliver to the plan members. The amount paid to the pharmacies is referred to as the "Reimbursement Rate." The insurance plans then compensate the PBMs for arranging the transaction and arranging for payment to the pharmacies for delivering the drugs and services to the plan members. The retail pharmacies also purchase certain claim processing services from the PBMs at prices the pharmacies agree to pay. The payments for these claims processing services are referred to as "Transaction Fees."

3.      PBMs compete against each other to establish convenient and efficient pharmacy networks for the delivery of drugs and drug services to their health insurance clients' plan members. PBMs compete against each other to sign reliable and efficient retail pharmacies with convenient locations for their networks. The areas of competition include Reimbursement Rates for the pharmaceutical products and services that retail pharmacies provide, and Transaction Fees for the claims processing services performed by the PBMs for the retail pharmacies.

4.      Depending on the metric used, ESI is the first or second largest PBM in the United States and asserts that it serves 100 million plan members. Prime is the sixth largest PBM in the United States and manages the pharmaceutical plan benefits for approximately 33 million plan members. Due to its greater size and ability to provide access to a greater number of customers (*i.e.*, plan members) to the retail pharmacies, ESI is able to use its market power to extract from retail pharmacies (1) lower Reimbursement Rates and (2) higher Transaction Fees than Prime. Thus, before the unlawful agreement alleged herein, ESI remitted lower Reimbursement Rates and charged higher Transaction Fees to retail pharmacies, including the Plaintiffs named in this Complaint, than did Prime.

2

5.      In late 2019, ESI and Prime entered into an anticompetitive and unlawful horizontal agreement (the "Agreement") that became effective on April 1, 2020.  Under the Agreement, Prime and ESI effectively agreed that (1) the Reimbursement Rates offered by both Prime and ESI applicable to retail pharmacies would be at the lower ESI rate and (2) the Transaction Fees demanded by and paid to both Prime and ESI by the retail pharmacies for claims processing services would be at the higher ESI rate.  Thus, all horizontal price competition between Prime and ESI for Reimbursement Rates paid to pharmacies and Transaction Fees paid by pharmacies was extinguished.

6.      The horizontal Agreement between ESI and Prime is a naked restraint of trade. ESI and Prime have not combined or integrated any meaningful assets or business functions. Pharmacies delivering drugs and services to plan members whose plans have retained Prime continue to pay Prime for transaction services and continue to be reimbursed for drugs delivered to such plan members by Prime and Prime alone.  The only material change in the three-part relationship among Prime, Prime's insurance-plan client, and the pharmacy is that the pharmacy's reimbursements and transaction fees are now at the ESI rate.  The Prime insurance plan client elects to have Prime reimburse the pharmacy at the lower rate (thereby lowering the plan's costs), but no other change takes place.

7.      The Prime/ESI Agreement does not integrate any efficiency enhancing or procompetitive economic functions performed by ESI and Prime, and instead merely serves as a price-fixing mechanism.  Although insurance-plan clients of Prime ostensibly are given the "choice" of whether the retail pharmacies are compensated at the generally lower ESI Reimbursement Rate or at the generally higher Prime Reimbursement Rate, there is no meaningful change as to whether it is an ESI or Prime transaction apart from the prices that are paid to

3

pharmacies. The plans that contracted with Prime continue to do business with Prime (not ESI), and the transactions remain Prime (and not ESI) transactions which are processed by Prime for plans that it represents.

8.    The Transaction Fees, although set at the higher ESI rate, continue to be charged by Prime (not ESI) for claims processing services performed by Prime (not ESI). Thus, the purchase of services and drugs from the retail pharmacy that generates the Reimbursement Rate continues to be a Prime transaction. The only difference is that the plan, not surprisingly, chooses to have the Prime transaction performed at the lower ESI Reimbursement Rate. As part of their Agreement, Prime and ESI also have agreed that the Transaction Fee paid to Prime by the pharmacies in return for Prime performing claims processing services are charged at the higher ESI rate, even though the claims processing was performed by Prime.

9.    The price-fixing activity, with regard to both the lower Reimbursement Rates paid to the pharmacies and higher Transaction Fees paid by the pharmacies, is not ancillary to any legitimate or lawful aspect of the Agreement. The Agreement constitutes a *per se* violation of § 1 of the Sherman Act. It also constitutes a Rule of Reason violation of § 1 as it unreasonably restricts competition in the relevant market(s) (defined below) within the meaning of the Rule of Reason by (1) raising the price of claims processing services sold to the Plaintiffs and other Class members by Prime above the competitive level; and (2) suppressing the Reimbursement Rate paid to retail pharmacies for the delivery of pharmaceutical products and services to Prime plan members below the competitive level. In so doing, the horizontal Agreement alleged herein allows Prime and ESI to unlawfully obtain, maintain and exercise both monopoly power and monopsony power in violation of § 2 of the Sherman Act.

4

10.     Plaintiffs and the other retail pharmacy class members are injured by the anticompetitive conduct alleged herein because the Prime/ESI Agreement has impaired the competitive free market forces that otherwise would determine the prices at which Prime would buy and sell services and products to and from retail pharmacies. As a result, retail pharmacies, including the Plaintiffs, pay higher Transaction Fees to Prime and receive lower Reimbursement Rates from Prime.  Impairing horizontal competition between Prime and ESI has allowed Prime and ESI to collectively obtain and/or maintain market power, monopoly power and monopsony power in the relevant markets.  The unlawful Agreement also injured competition by reducing consumer choice, suppressing the output of retail pharmacy services, and decreasing the quality of retail pharmaceutical services, all without any countervailing procompetitive effects.   By obstructing the free-market forces that otherwise would determine the prices paid to retail pharmacies for the products and services they provide to Prime plan members, and the prices paid by retail pharmacies for claims processing services purchased from Prime, the unlawful Agreement misallocates resources and suppresses the supply of retail pharmacy services offered.

11.     Plaintiffs bring this action on behalf of themselves and on behalf of a class of all retail pharmacies that have transacted business with both Prime and ESI since April 1, 2020. The time period from April 1, 2020 until such time as Prime and ESI discontinue their anticompetitive conduct is referred to herein as the "Class Period."

## II.     Plaintiffs

12.     Plaintiff Elk River Pharmacy Inc. d/b/a Kemper Corner Drug is a corporation having a principal place of business in Elk River, Minnesota. This Plaintiff is a retail pharmacy that conducted business during the relevant time with both ESI and its co-conspirator Prime.

5

13. Plaintiff STRB Inc. is a corporation having a principal place of business in Elkhorn, Wisconsin. This Plaintiff conducted business during the relevant time with both ESI and its co-conspirator Prime.

14. Plaintiff Handicapable, Inc. D/b/a Medicine To Go Pharmacies is a corporation having a principal place of business in New Jersey. This Plaintiff is a retail pharmacy that did business during the relevant time with both ESI and its co-conspirator Prime.

15. Plaintiff The Pharmacy Station Inc. is a corporation having a principal place of business in Burlington, Wisconsin. This Plaintiff is a retail pharmacy that did business during the relevant time with both ESI and its co-conspirator Prime.

### III. Defendants and Co-Conspirators

16. Defendant Express Scripts, Inc. is a corporation organized under the laws of Delaware and headquartered at 1 Express Way, St. Louis, Missouri 63121. Express Scripts, Inc. is a PBM and is the largest PBM in the country based on market share. Express Scripts, Inc. is a subsidiary of Express Scripts Holding Company. ESI is now owned by Cigna, which closed its $67 billion purchase of ESI at the end of 2018. In 2019, ESI contributed $2.6 billion to Cigna's pharmacy revenues. Cigna has since folded ESI into its Evernorth division, which combines pharmacy benefits, home delivery pharmacy, and specialty pharmacy services. In 2022, Evernorth, of which ESI is a substantial part, contributed over $140 billion to Cigna's revenues and over $6 billion to its profits. On information and belief, ESI acts on behalf of more than 3,000 payors, including a number of Blue Cross and/or Blue Shield branded plans, and asserts that it serves more than 100 million healthcare plan members. Starting in January 2024, ESI will administer pharmacy benefits for an additional 20 million plan members of Centene, which provides healthcare through commercial plans and government-sponsored plans.

6

17.     Co-conspirator Prime is a limited liability company organized under the laws of Delaware and headquartered at 2900 Ames Crossing Road, Eagan, Minnesota 55121. Prime is usually regarded as the sixth largest PBM, although some metrics suggest it is as large as the third largest PBM. Regardless, it is a horizontal competitor of ESI, and Cigna identifies Prime as a key PBM competitor of ESI. Prime serves as a PBM for 18 Blue Cross and Blue Shield branded healthcare plans and five other plans and direct employer groups. Prime professes to manage the pharmacy benefits for approximately 30 million plan members.

## IV.     Jurisdiction and Venue

18.     This Complaint is a civil antitrust action arising under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26). This Court has subject-matter jurisdiction over this action pursuant to 18 U.S.C. §§ 1331 and 1337(a).

19.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because each Defendant is found or transacts business in this District and two of the Plaintiffs conducted business in this District during the relevant period.

20.     During the Class Period, ESI and its co-conspirator, Prime, sold certain PBM services to pharmacies and facilitated the purchase of pharmaceutical products and services from pharmacies in a continuous and uninterrupted flow of interstate commerce, including in this district and throughout the United States. ESI's and Prime's wrongful conduct directly, substantially, and reasonably foreseeably affected interstate commerce in the United States, including in this district.

## V.     Background

21.     PBMs such as ESI and Prime function as aggregators of market power in the distribution of prescription drugs. PBMs administer, on behalf of private and public health

insurance plans, employers, governments, and plan sponsors the acquisition of prescription drugs from retail pharmacies, such as the Plaintiffs, and negotiate the Reimbursement Rates paid to pharmacies for the drugs and services they provide to plan members. Plan sponsors hire PBMs to administer plans for prescription drug benefits provided to their members.

22.     PBMs initially were founded to process pharmaceutical claims for healthcare plans. In the late 1980s, PBMs began to create more significant "pharmacy benefit" services by creating a system for reimbursement of drug claims, claims processing, and drug dispensing control. PBMs contract with drug manufacturers and pharmacies to create these distribution, reimbursement and claims processing services. PBMs negotiate with drug manufacturers to have their drugs included in the PBM's formulary and contract with retail pharmacies to distribute drugs and services to plan members at Reimbursement Rates agreed to and negotiated by the PBM.

23.     The accumulation of market power that comes from being able to make drug selection and purchase/distribution decisions for tens of millions of plan members allows the large PBMs to obtain payments (in the form of kickbacks and other compensation) from drug manufacturers in exchange for promoting the use of the manufacturer's drugs, even when the cost of such drugs is higher than equivalent or even superior alternatives. PBMs ostensibly are hired to provide pharmacy benefit plan services to health plans based on their touted expertise, including determining which drugs should be included on the plan's formulary, and therefore covered by the plan.

24.     PBMs promote the use of manufacturers' drugs by including them on health plan formularies. Health plans hire PBMs to advise them as to which drugs should be included on the health plan formulary, and therefore which drugs should be covered and paid for when dispensed by the pharmacy. If a drug is not on the formulary, it is not covered, and the pharmacy either will

not dispense the drug or will dispense it and turn to the patient to cover the full cost of the prescribed drug.

25.     By accumulating vast purchasing power, the large PBMs also are able to exert significant purchaser-power leverage against even large retail pharmacy chains in the negotiation of pharmacy Reimbursement Rates.  These PBMs likewise exercise seller-power leverage in the negotiation of the Transaction Fees charged to retail pharmacies by PBMs for claims processing services.

26.     Plaintiffs and other retail pharmacies cannot realistically avoid doing business with PBMs.   Doing so would eliminate their ability to participate in the overwhelming majority of prescription drug purchases, because members of a plan that uses a PBM would be told that their insurance will not cover drugs obtained at that pharmacy.  PBMs determine which drugs are covered by the health plans and therefore reimbursed or paid for when dispensed by the pharmacy. Retail pharmacies at one time were able to interact directly with healthcare plans and drug manufacturers.  But PBMs have over the last 35 years come to dominate the prescription drug distribution and delivery system.  Pharmacies have little to no choice but to agree to the PBMs' terms.

27.     The PBM market is highly concentrated.  By 2015, 78% of all U.S. prescriptions were controlled by the three largest PBMs. *See, e.g*., David A. Balto, "The State of Competition in the Pharmacy Benefits Manager and Pharmacy Marketplaces," House Judiciary Subcommittee on Regulatory Reform, Commercial, and Antitrust Law (November 17, 2015) (noting that in 2015, the 3 major PBMs covered 78% of the market and 180 million plan members).

28.     By 2016, PBMs collectively controlled prescription benefit services for 266 million people in the U.S. (at a time when the total U.S. population was ~325 million). By 2018, that

9

number had jumped to 295 million Americans, accounting for over 90% of all pharmaceutical prescriptions.

29.     By 2018, the PBM market had become even more highly concentrated into a tight-knit oligopoly.  The largest 3 PBMs accounted for approximately 76% of the PBM market, when measured by dollar volume.  The top 5 PBMs accounted for approximately 89% of the PBM market, and the top six PBMs accounted for approximately 95% of the PBM market.

30.     According to the President's Council of Economic Advisors, market concentration in the PBM market is even higher, with the top 3 PBMs controlling over 80% of the PBM market.

31.     A recent study by the AMA calculated mean Herfindahl-Hirschman Index ("HHI") values (an index of market concentration) for the PBM industry of approximately 3700 across all states, and approximately 4100 across all metropolitan areas. A market with an HHI of 2500 or more is considered to be highly concentrated and not competitively structured.  Markets with HHIs of more than 2500 raise significant antitrust concerns.

32.     Understanding PBMs requires understanding who the key players in the prescription drug market are, including: pharmaceutical companies, wholesalers, retail pharmacies, healthcare benefit providers (such as insurance companies, self-insured employers, union health and welfare plans and government plans such as Medicare and Medicaid), PBMs, and plan members.

    a.  Pharmaceutical companies manufacture and market drugs. Pharmaceutical companies typically own or contract with facilities that manufacture those drugs and then sell their products to wholesalers and distributors.

    b.  Wholesalers and distributors purchase drugs at wholesale from pharmaceutical companies and take physical possession of the drugs. The drug wholesale industry is

10

highly concentrated, with three key players—AmerisourceBergen, McKesson, and Cardinal—accounting for 85-90% of the wholesale market. Wholesalers typically earn a distribution service fee based on a percentage of a drug's purchase price.

c. As described herein, PBMs contract with healthcare plans (insurance companies, self-insured employers, union health care plans, Medicare, Medicaid, etc.) to administer a pharmaceutical benefit plan for the healthcare plan. The PBMs then contract with retail pharmacies for the delivery of drugs and drug services to plan members who are covered by the healthcare plan at Reimbursement Rates negotiated by the pharmacy and the PBM. PBMs also sell to retail pharmacies certain services associated with the processing, adjudication and payment of pharmacy claims. The pharmacies pay the PBM a Transaction Fee for these claims processing services.

d. PBMs also contract with drug companies to put certain drugs on the PBM's formulary. Being on the formulary (and thereby being covered by insurance) increases the sales of the included drugs. In return for being placed on a PBM's formulary, the drug companies often pay the PBM a sum of money for the acquisition of applicable drugs by a plan member covered by that PBM. These payments, which can be and increasingly are substantial, increase the drug companies' costs and often cause them to raise the prices of their drugs to wholesalers, who then pass on the price increase to retail pharmacies like Plaintiffs.

e. Health benefit providers include insurance companies, self-insured employers, and health and welfare plans, including union-run health plans, and private plans that sponsor Medicaid and Medicare drug benefits. Health benefit providers submit payments on behalf of insured individuals to healthcare providers (doctors and

11

medical facilities) for services rendered to the insured individuals. Health insurers also contract with PBMs to have them procure from pharmacies the retail delivery of drugs and drug services to plan members.

33.     The following chart from Avalere Health LLC provides a visual representation of the relationship between PBMs and other parties:



34.     As PBMs represent more plan members, they accumulate greater levels of buyer-side aggregate market power (*i.e.*, monopsony power) and are able to negotiate higher rebates from drug manufacturers and lower Reimbursement Rates with retail pharmacies for the purchase of drugs and drug services from the pharmacies for delivery to plan members whose plans have contracted with the PBM.  As a PBM represents greater numbers of plan members, it also is able to aggregate seller-side market power (*i.e.*, monopoly power) and is able to charge retail pharmacies higher prices (*i.e.*, Transaction Fees) for claims processing services.

12

Many PBMs also operate their own pharmacies and use their market power to advantage those pharmacies over Plaintiffs. For example, ESI operates Express Scripts Pharmacy, which is an online competitor of retail pharmacies. According to Cigna's 2022 10-K, "Express Scripts Pharmacy dispenses approximately 1.6 billion adjusted prescriptions annually to members of pharmacy plans managed by our Express Scripts PBM."

## VI. The Prime/ESI Agreement

35. In December 2019, Prime and ESI announced a three-year "collaboration" agreement (the "Agreement"). For private healthcare plans and Medicaid, the Agreement became effective on April 1, 2020. For Medicare, the Agreement became effective on January 1, 2021.

36. Under the Agreement, both Prime and ESI continue to separately perform all of their material respective pharmacy related functions other than (1) the setting of the Reimbursement Rate paid to pharmacies for the delivery of drugs and drug services to plan members, and (2) the setting of the Transaction Fees that pharmacies are charged by Prime and ESI for claims processing services.

37. Under the Agreement, the processing of claims, formulary management, billing benefits management, adjudication of claims, and all other pharmacy related PBM functions (other than the establishment of the Reimbursement Rate and the Transaction Fee rate) previously performed by Prime are still performed by Prime, and all of the pharmacy related PBM functions (other than the setting of the Reimbursement Rates and Transaction Fee rates) previously performed by ESI are still performed by ESI. Prime continues to own all of the Prime transactions and customer relationships with both the plan sponsors and the retail pharmacies with which it has contracted, and all of the PBM services associated with Prime transactions continue to be performed by Prime. The same is true for ESI.

13

38.     Under the Agreement, however, the pricing function for goods and services purchased by or sold to retail pharmacies are no longer separate.  Instead, Prime and ESI have agreed that, with the approval of the plan sponsor, the PBMs will offer only the lower Reimbursement Rate and charge the higher Transaction Fee rate.  And this is true even though the plan sponsor has contracted only with Prime and has not retained ESI to perform any PBM services and ESI in fact performs no such services for the plan sponsor.

39.     In effect, ESI and Prime agreed that the Reimbursement Rates paid to pharmacies for delivering drugs and services on Prime transactions, and the Transaction Fees paid by pharmacies to Prime for claims processing services, will not be at the levels previously negotiated between the pharmacy and Prime.  Instead, the Reimbursement Rates and Transaction Fees paid by and received by Prime are now set and fixed at the lower Reimbursement Rate and the higher Transaction Fee rate negotiated by ESI.  ESI, due to the large number of covered lives it represents, enjoys substantial market power as a buyer in the Pharmacy/PBM Reimbursement Rate Market and as a seller in the Pharmacy/PBM Transaction Fee Market.  In effect, the Agreement allows Prime to borrow ESI's substantial market power to impose lower Reimbursement Rates and higher Transaction Fees on the plaintiffs and the other retail pharmacies.  On information and belief, Prime and ESI share the anticompetitive rents thus extracted from both markets.

40.     Despite the agreement to set prices for goods and services both bought and sold at the more favorable (to the PBM) ESI price, the Agreement provides that both Prime and ESI will continue to independently manage negotiations for the medical benefit and value-based contracting, formulary development, custom network options, and value-based care strategies and contracting.

14

41.     As a result of the Agreement, Prime's commercial and Medicaid network supposedly "transitioned" to ESI's commercial and Medicaid pharmacy networks.  However, this "transition" was euphemistic and in name only; Prime and ESI continue to operate their own networks, and the only thing that materially "transitioned" from Prime to ESI were the prices for the relevant products and services, which are now collectively set at the levels established by ESI.

42.     The purpose and effect of the Agreement is to allow Prime to participate in ESI's monopsony and monopoly pricing with respect to the Reimbursement Rates paid to pharmacies and the Transaction Fees paid by pharmacies.  It also allows Prime to participate in and further enhance ESI's monopsony and monopoly power with respect to the prices paid and fees charged to drug manufacturers. Conversely, in some very local markets where Prime has the dominant market share and is able to exert more monopsony and monopoly power than ESI, ESI is able to participate in Prime's market power.

43.     Under the Agreement, both Prime and ESI continue to separately perform all of the PBM pharmacy-related functions except for the setting of the prices.  The Agreement does not, and is not intended to, achieve any efficiencies or economies of scale or procompetitive effects in the relevant markets, and the assertion of any such efficiencies or procompetitive effects by either Prime or ESI is pretextual.  The Agreement is simply a naked restraint on price competition with regard to Reimbursement Rates and Transaction Fees.

## VII.     Anticompetitive Effects

44.     The combination, conspiracy and agreement alleged herein has had anticompetitive effects in one or more relevant markets, including:

    a.  The price competition between Prime and ESI for purchase of drug delivery and retail pharmacy services has been suppressed and eliminated, and the prices paid to retail

15

pharmacies for those services has been reduced below the competitive free market level that had been negotiated before the Agreement between Prime and ESI;

b. The price competition between Prime and ESI to sell claims processing services to retail pharmacies has been suppressed and eliminated, and the Transaction Fees paid by retail pharmacies to Prime for claims processing services has been raised and fixed above the level that had been negotiated before the Agreement between Prime and ESI;

c. The Transaction Fees and Reimbursement Rates charged by and provided to Prime and ESI have been and are being artificially fixed and maintained at non-competitive levels;

d. Competition to obtain a higher quality of service from retail pharmacies for delivery to plan members has been reduced and eliminated;

e. Plan member choice for retail pharmacy services has been reduced or eliminated; and

f. The output of retail pharmacy services has been suppressed below the level that would result in an unrestrained market.

45. During the Class Period, Plaintiffs and members of the class directly purchased claims processing services from Prime and ESI and directly provided drug and drug delivery services to Prime and ESI. As a result of the Prime/ESI Agreement, the Plaintiffs and members of the class have paid anticompetitively elevated Transaction Fees and have been paid anticompetitively suppressed Reimbursement Rates that they would not have experienced in the absence of the anticompetitive Agreement.

46. Because Prime's and ESI's unlawful conduct has successfully eliminated the independent negotiations of price and competition in one or more of the relevant markets, the

16

Plaintiffs and class members have sustained, and continue to sustain, significant damages in the form of anticompetitively determined prices that they (1) pay for claims processing services to Prime and ESI and (2) receive as the Reimbursement Rate for delivering drugs and pharmaceutical services to Prime-covered plan members. The full amount of such damages for both the Reimbursement Rate underpayments and the Transaction Fee overcharges will be calculated after discovery and upon proof at trial.

47.     The Prime/ESI anticompetitive conduct is ongoing, and, as a result, Plaintiffs and members of the Class continue to incur the competitive harm alleged herein.

## VIII.     Market Power

48.     A relevant market for purposes of the Sherman Act has two component parts: (1) the relevant product[1] market and (2) the relevant geographic market.

49.     There is a relevant product market in which PBMs purchase drug and drug delivery services from retail pharmacies for the benefit of individuals who are plan members whose healthcare plan has retained the services of that PBM (hereinafter the "Pharmacy/PBM Reimbursement Market").

50.     There is a relevant product market for the purchase by retail pharmacies of claims processing services from PBMs (hereinafter the "Pharmacy/PBM Transaction Fee Market").

51.     In both relevant product markets, the retail pharmacy enters into a contract with the PBM. That contract governs the drugs that the retail pharmacy may dispense to a patient, the terms for reimbursement to the pharmacy for those drugs, and the Transaction Fees charged by the PBM and paid by the pharmacy. Although these elements – dispensing, reimbursement, and fee payment

---

[1]     The term "relevant product market" includes the purchase and sale of both physical products and services.

17

– do not occur simultaneously (and indeed PBMs routinely claw back reimbursements months or even years after the pharmacy dispenses drugs to its patients) and there are several other disparate interactions among PBMs, drug manufacturers, health plans, and plan members, there is a relevant transactions product market for the delivery of prescription drugs facilitated by PBMs.

52.　The relevant geographic market for all relevant product markets is the United States.　Alternatively, there are relevant geographic markets in any Metropolitan Statistical Area in which Prime or ESI possess market power.

53.　Even before its Agreement with Prime, ESI enjoyed significant pricing power due to its substantial market share (between 38 and 23 percent depending on metric) and ability to aggregate the purchasing power of more than 100 million insured individuals.

54.　Market share does not tell the full story, however, because pharmacies are not typically able to decline to deal with ESI because of the 100 million insureds for whom it acts as a market power aggregator.　Prime, ESI and other large PBMs use their aggregated market power to demand Reimbursement Rate reductions from pharmacies in exchange for the pharmacies having access to PBMs' aggregated demand for hundreds of millions of plan members.　The larger the number of plan members that a PBM represents, the larger the aggregated demand that it controls and the greater is the market power that it exerts over Reimbursement Rates.　In the contract negotiations between retail pharmacies and large PBMs, the retail pharmacy must either bow to the PBM's aggregated demand and agree to pay higher Transaction Fees and reduced Reimbursement Rates or lose access to tens of millions of plan members. Plaintiffs and other pharmacies have no realistic option to cease contracting with Prime or ESI or the other large PBMs in light of the aggregated market power that each represents.

55.     Moreover, consumers are locked into the insurance coverage that they have purchased.  A pharmacy confronted with the decision whether to accept the terms that a PBM offers cannot compete for the consumer's business by offering a lower price at the pharmacy counter because, among other reasons, the consumer has already pre-committed to using the insurance coverage for which she has paid.  It would therefore be difficult for a pharmacy to operate without serving ESI covered lives; ESI knows this, which allows it to exert even more market power than its market share would otherwise suggest under a cursory evaluation.

56.     As a result of the Agreement, Prime and ESI get to choose the lower Reimbursement Rates and the higher Transaction Fees that each had previously negotiated with the pharmacy. In most cases, this means that the pharmacy must now accept the lower ESI Reimbursement Rates and its higher Transaction Fees for Prime transactions, essentially allowing Prime to leverage ESI's market power for its own use.

57.     This market power is confirmed by numerous other facts. Among these is the indisputable fact that the ESI Reimbursement Rates are below, and its Transaction Fees are above, the competitive level. Even if the Prime rates were competitive—they were not, for the reasons noted above—the ESI rates are non-competitive compared even to the Prime's rates.  Prime's Transaction Fees were at least 10% greater than, and its Reimbursement rates at least 10% less than, those of ESI.

58.     Moreover, within the last five years ESI has reduced its Reimbursement Rates by more than 10% and increased its Transaction Fees by more than 10%, with no basis in a change in its costs.

59. Furthermore, since at least the date of the Agreement, ESI has enjoyed supracompetitive profits. ESI's Reimbursement Rates and Transactions are principal sources of those supracompetitive profits.

60. ESI's market power is further illustrated by its ability to impose these noncompetitive Reimbursement Rates and Transaction Fees on retail pharmacies.

## IX. Class Allegations

61. Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), Plaintiffs bring this action on behalf of a class of retail pharmacies that directly provide drug delivery and other retail pharmacy services to and at the request of Prime and ESI in return for reimbursement fees negotiated with Prime and ESI, respectively, and also directly purchase from Prime and ESI Transaction Services at prices negotiated with and paid to Prime and ESI during the period of April 1, 2020 to the present.

   a. The class ( "Class") is defined as follows: All non-PBM owned retail pharmacies that (1) directly sold in the relevant product and geographic market drugs and drug delivery services to or at the request of Prime and ESI at Reimbursement Rates that were or, but for the Agreement alleged herein, would have been separately negotiated by Prime and ESI, and (2) directly purchased in the relevant product and geographic market Transaction Services from Prime and ESI and paid Prime and ESI Transaction Fees for those services from April 1, 2020 through the present (the "Class Period").

   b. This class excludes Prime and ESI, their officers, directors, managers, employees, subsidiaries, or affiliates, and all governmental entities. It also excludes non-retail pharmacies, specialty pharmacies, or pharmacies in which one or more PBM has an

ownership interest or that is vertically integrated or aligned with a PBM, including Express Scripts Pharmacy.

62. The Class is composed of thousands of members that are geographically dispersed across the United States so that joinder of all Class members is impractical.

63. The Class members are readily identifiable from information and records maintained by ESI and Prime.

64. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs' interests are not antagonistic to the claims of the other members of the Class, and Plaintiffs have no material conflicts with any other members of the Class that would make class certification inappropriate.

65. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Prime and ESI. Plaintiffs and all members of the Class (1) directly sold drugs and drug delivery services to or through Prime and were reimbursed at the suppressed and fixed lower Reimbursement Rates negotiated by ESI, and (2) directly purchased Transaction Services from Prime but were charged and paid the artificially increased and fixed prices negotiated by ESI.

66. Plaintiffs will fairly and adequately protect and represent the interests of all members of the Class. Plaintiffs' interests are consistent with, and not antagonistic to, those of the members of the Class.

67. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation, particularly antitrust claims.

68. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Prime and ESI have acted on grounds generally applicable to the entire Class so that determining damages with respect to

21

the Class as a whole is appropriate. Such generally applicable conduct is inherent in the wrongful conduct alleged herein.

69.     The predominant common legal and factual questions applicable to all members of the Class include, but are not limited to, the following:

a. Whether and to what extent Prime and ESI engaged in a contract, combination, conspiracy or agreement to eliminate competition in the relevant markets and thereby (1) artificially increased the price paid by the Class members to Prime for Transaction Services and (2) artificially decreased the Reimbursement Fees;

b. The duration and extent of the alleged contract, combination, conspiracy or agreement;

c. The anticompetitive effects of the contract, combination, conspiracy or agreement in the relevant market(s) in the United States during the Class Period;

d. Whether Defendants' conduct caused anticompetitive Transaction Fees and Reimbursement Rates for services and/or products in the relevant market(s);

e. Whether, and to what extent, the conduct of Prime and ESI caused antitrust injury to Plaintiffs and members of the Class;

f. Whether the alleged contract, combination, conspiracy or agreement violated Section 1 of the Sherman Act, 15 U.S.C. § 1; and

g. Whether the alleged conduct violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

70.     These common questions do not vary among the members of the Class, so the Court and the jury may resolve those issues without reference to the individual circumstances of any member of the Class.

71.     Class action treatment is a superior method for the fair and efficient adjudication of the claims asserted by all members of the Class. Such treatment will permit many similarly situated entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.

72.     The benefits of proceeding through the class mechanism, including providing all members of the Class a method for obtaining redress on claims that they could not practicably pursue individually, substantially outweigh potential difficulties in the management of this litigation as a class action.

73.     Plaintiffs are not aware of any special difficulty to be encountered in the management of this action that would preclude maintaining it as a class action.

74.     In addition, ESI and Prime have acted or refused to act on grounds that apply generally to the class, so that injunctive relief and declaratory relief is appropriate respecting the class as a whole.

## X.     Causes of Action

### Claim 1: *Per Se* Violation of Section 1 of the Sherman Act

75.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

76.     Prime and ESI entered into, and engaged in, a horizontal agreement, combination or conspiracy that (1) fixed the Transaction Fees paid by pharmacies for claims processing services and (2) fixed the Reimbursement Rate paid to pharmacies in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

77.     The Agreement constitutes horizontal price-fixing and is a *per se* violation of Section 1 of the Sherman Act.

78.     The unlawful Agreement has caused the Plaintiffs and the Class members to suffer antitrust injury because they have paid Transaction Fees that are above the competitive level and have received Reimbursement Rates that are below the competitive level as a result of the Agreement.

79.     The anticompetitive acts alleged herein had a direct, substantial and reasonably foreseeable effect on interstate commerce by fixing the above-referenced prices throughout the United States.

80.     As a result of the unlawful Agreement, Plaintiffs and members of the Class have been injured in their business and property in that they have been forced to pay higher costs for Transaction Fees than they would have paid in the absence of the unlawful Agreement and they have received lower Reimbursement Rates than they would have received in the absence of the unlawful Agreement. The full amount of the damages caused by the unlawful fixing of both the Transaction Fees and the Reimbursement Rates is presently unknown but will be determined after discovery and upon proof at trial.

81.     The unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

Claim 2: Rule of Reason Violation of Section 1 of the Sherman Act

82.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

83.     The Prime/ESI Agreement constitutes a contract, combination or conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

24

84.     ESI, by itself, has market power within the relevant product markets alleged herein. When combined with the purchasing power (*i.e.*, monopsony power) of Prime in the Pharmacy/PBM Reimbursement Market and the selling power (*i.e.*, monopoly power) of Prime in the Pharmacy/PBM Transaction Fee Market, the combination of Prime and ESI has substantial monopoly and monopsony power due to their combined representation of nearly half of all the U.S. consumers covered by PBM services.   This monopoly and monopsony power are demonstrated by the ability of Prime and ESI together to profitably raise the Transaction Fees paid to Prime substantially above the competitive level and to profitably suppress the Reimbursement Rates paid by Prime to pharmacies substantially below the competitive level.

85.     The Agreement unreasonably restrains competition in the relevant markets.

86.     The Agreement has caused the Transaction Fees paid by the Plaintiffs and Class members to Prime and ESI for claims processing services to be artificially elevated above the competitive level and has caused the Reimbursement Rates paid to the Plaintiffs and other Class members to be artificially suppressed below the competitive level.

87.     The Agreement misallocates economic resources by undercompensating pharmacies for products and services provided to plan members and overcompensating Prime for claims processing services provided to or purchased by the Plaintiffs and Class members and reduces the available output of retail pharmacy services to consumers and plan members.

88.     The Agreement, by reducing the economic incentive to invest in providing retail pharmacy services, reduces consumer and plan member choice of pharmacies, and reduces the quality and convenience of pharmacy services offered to consumers and plan members.

89.     The Agreement does not integrate any economic functions that could even plausibly create any economic efficiencies or economies of scale in the relevant markets and does not produce any procompetitive effects in the relevant markets.

90.     Even if one assumes *arguendo* that the Agreement results in procompetitive effects or the integration of economic functions that create some economic efficiency, economy of scale, or procompetitive effect, any such benefits could easily be achieved by significantly less restrictive measures than the horizontal aggregation of market power and the elimination of horizontal price competition.

91.     Furthermore, any such hypothesized procompetitive effects are substantially outweighed by the demonstrable anticompetitive effects, including the direct anticompetitive suppression of the free-market forces that would otherwise determine price in both relevant markets.

92.     The anticompetitive conduct alleged herein is not ancillary to the achievement of any legitimate procompetitive goal.  To the contrary, the anticompetitive price-fixing objectives of the Agreement are the primary, if not the exclusive, objectives and effect of the Agreement.

93.     Other than combining the pricing functions in the hands of the Prime/ESI combination, Prime has disavowed any intention of combining business functions so as to increase efficiency or economies of scale.  For example, although its Reimbursement Rates would be established by the ESI price schedule, Prime advised pharmacies on February 28, 2020 that Prime "will continue to process claims on behalf of our Benefit Sponsors."  The only participation by ESI in the process will be to add an ESI network identifier to the Prime computer system so that the ESI fees and rates will be imposed on the Prime transactions.

26

94.    Prime has opaquely described the Agreement with ESI as a three-year "supply-chain agreement" and has stated that it will continue to process all Prime claims, continue to handle its own billing and benefits management and perform all other PBM functions.  Its only substantial or significant integration with ESI is using the higher ESI price list for Transaction Fees and the lower ESI price list for Reimbursement Rates.  Indeed, in its January 2, 2020 press release, Prime stated that it "will continue to operate our claims processing platform as well as manage and deliver a wide range of services to our clients and their members, including network management, formulary management, and chemical programs."

95.    Prime CEO, Ken Paulus, confirmed these facts in a Sept. 28, 2021 interview conducted by Peter Wehrwein and published in Managed Healthcare.  In that interview, Paulus acknowledged that other than using ESI prices "we didn't really change anything at Prime…. We still process our own claims.  We own the claim system.  We do all our own PAs, contact center, utilization management – we do everything ourselves….  So it's been a fairly elegant solution for us as a way to save significant dollars … but do so without giving up our strategic optionality, which is continuing to run our own business.  Paulus concluded by stating "we're basically still doing all the functions of the PBM except for the procurement."

96.    Prime and ESI individually and collectively have a sufficiently substantial percentage of the relevant market(s) to harm competition.

97.    By reason of the unlawful Agreement alleged herein, Plaintiffs and the Class members have suffered antitrust injury in that they have been charged anticompetitively elevated Transaction Fees and have been paid anticompetitively suppressed Reimbursement Rates.  As a result, the Plaintiffs and Class members have suffered injury to their business or property and have

sustained damages in amounts that are presently undetermined but will be subject to discovery and presented at trial.

98.     The unlawful conduct as alleged herein poses a significant, continuing threat of antitrust injury for which injunctive relief is appropriate under Section 16 of the Clayton Act.

<u>Claim 3: Monopolization under Section 2 of the Sherman Act</u>

99.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

100.    By virtue of their Agreement, Prime and ESI acquired (1) the power to substantially increase the Transaction Fees paid by retail pharmacies for claims processing services without losing sufficient sales in the Pharmacy/PBM Transaction Fee Market to make the increase unprofitable (monopoly power), and (2) the power to substantially suppress the Reimbursement Rates paid to pharmacies without suffering sufficient pharmacy defections in the Pharmacy/PBM Reimbursement Market to make the reduction unprofitable (*i.e.*, monopsony power). Prime and ESI thereby willfully acquired and maintained monopoly power and monopsony power in the respective relevant markets through anticompetitive means and have exercised that monopoly power and monopsony power to set prices that are above the competitive level in the Pharmacy/PBM Transaction Fee Market and are below the competitive level in the Pharmacy/PBM Reimbursement Market.

101.    Neither the monopoly power nor the monopsony power alleged herein was obtained by superior skill, business acumen or historic accident, and neither was obtained by conduct that is honestly industrial or reflective of competition on the merits.

102.    As a direct and proximate result of the exercise by Prime and ESI of their anticompetitively acquired or augmented monopoly and monopsony power, the Plaintiffs and the

28

Class members have suffered antitrust injury to their business or property by virtue of (1) having paid anticompetitively elevated Transaction Fees in the Pharmacy/PBM Transaction Fee Market and (2) having received anticompetitively suppressed Reimbursement Rates in the Pharmacy/PBM Reimbursement Market.

103.   As a direct and proximate result of ESI's and Prime's willful acquisition and/or maintenance of their unlawfully acquired or augmented monopoly and monopsony power, Plaintiffs and the Class members are threatened with continuing loss or injury for which they have no adequate remedy at law.  Plaintiffs will continue to suffer irreparable injury unless ESI's anticompetitive conduct and its participation in the unlawful Agreement alleged herein is enjoined by this Court.

### Prayer for Relief

WHEREFORE, Plaintiffs pray that judgment be entered in their favor and on behalf of all Class members and against ESI and that the Court order as follows:

A.  Certify the Class pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiffs as class representative, and appoint Plaintiffs' counsel as Class counsel;

B.  Declare that ESI and its co-conspirator, Prime, have violated Section 1 and Section 2 of the Sherman Act on account of the acts alleged herein;

C.  Enjoin ESI from any further participation in the unlawful Agreement alleged;

D.  Issue judgment against ESI for treble the damages sustained by Plaintiffs and members of the Class as provided for by Section 4 of the Clayton Act;

E.  Provide for pre-judgment and post-judgment interest, to the extent legally available, at the highest applicable legal rate;

29

F.  Order that Plaintiffs recover their costs of suit, including reasonable attorneys' fees and costs as provided by Section 4 of the Clayton Act; and

G.  Order such other and further relief as the Court deems just and proper.


### Jury Demand

Plaintiffs demand a trial by jury of all issues so triable.


Dated:  October 19, 2023                                  Respectfully submitted,


/s/ Joseph M. Vanek_____

Joseph M. Vanek, Bar Number 6197046
Paul E. Slater *(pro hac vice forthcoming*)
Phil Cramer *(pro hac vice forthcoming)*
Trevor Sheetz *(pro hac vice forthcoming)*
SPERLING & SLATER, LLC
55 W. Monroe Street, Suite 3200
Chicago, IL 60603
Telephone: (312) 641-3200
Email: jvanek@sperling-law.com
Email: pes@sperling-law.com
Email: pcramer@sperling-law.com
Email: tsheetz@sperling-law.com

Steve D. Shadowen (*pro hac vice forthcoming*)
Nicholas W. Shadowen (*pro hac vice forthcoming*)
Kathryn Allen (*pro hac vice forthcoming*)
HILLIARD SHADOWEN  LLP
1135 W. Sixth Street, Suite 125
Austin, TX 78703
Telephone: (855) 344-3298
Email: steve@hilliardshadowenlaw.com
Email: nshadowen@hilliardshadowenlaw.com
Email: kallen@hilliardshadowenlaw.com

30

Mark C. Cuker *(pro hac vice forthcoming)*
CUKER LAW FIRM
575 Pinetown Rd
PO Box 1151
Ft Washington PA 19034
Telephone: (215) 531-8522
Email: mark@cukerlaw.com

*Attorneys for Plaintiffs and Proposed Class*